IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NEZ PERCE TRIBE, | ) |
| | ) |
| Plaintiff, | ) Case No. CV04-299-C-EJL |
| | ) |
| vs. | ) MEMORANDUM DECISION AND ORDER |
| | ) |
| NATIONAL OCEANIC AND ATMOSPHERIC | ) |
| ADMINISTRATION FISHERIES, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

Pending before the Court in the above entitled matter are the parties' cross-motions for summary judgment and related motions to strike. The motions have been fully briefed and are ripe for the Court's review. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the court conclusively finds that the decisional process would not be significantly aided by oral argument, this motion shall be decided on the record before this Court without oral argument. Local Rule 7.1.

### Factual and Procedural Background

Plaintiff Nez Perce Tribe filed the instant action in the District of Oregon contesting the decisions and opinions of three federal agencies relating to the North Lochsa Face Ecosystem Management Project ("NLF Project"), located in the Clearwater National Forest ("CNF") in northern Idaho. Specifically, the action seeks review of 1. the United States Forest Service's ("USFS") final supplemental environmental impact statement ("FSEIS") and record of decision ("ROD"); 2. the National Oceanic and Atmospheric Administration Fisheries ("NOAA")/National Marine Fisheries Service ("NMFS") no jeopardy decision and biological opinion for Snake River Basin steelhead; and 3. the United States Fish and Wildlife Service ("FWS") decision and opinion concluding the NLF Project is not likely to adversely affect Columbia River bull trout. (Dkt. No. 9). Venue for this action has been transferred to this Court. (Dkt. No. 1).

MEMORANDUM DECISION AND ORDER - Page 1

The stated purpose of the NLF Project is to improve forest health, manage forest vegetation, restore ecological processes, reduce the risk of wildfire, control noxious weeds, improve aquatic conditions, provide economic benefits to local communities, remove off-site pine, and reduce stand densities and favor resilient early seral species. (FSEIS, p. 4). The selected alternative entails 4,032 acres of timber harvest, 12,530 acres of prescribed burning, construction of 3.5 miles of temporary roads, obliteration of 66 miles of roads, and certain other activities including control of noxious weeds and replanting of riparian areas. The NLF Project proposes five large timber sales resulting in approximately 42 million board-feet of timber being harvested on 4,032 acres. (Dkt. No. 10, p. 3). This area, Plaintiff argues, is "crucial fisheries habitat from imperiled Snake River steelhead and bull trout in the Lochsa River drainage." (Dkt. No. 9, p. 2). Plaintiff filed this action raising claims under the National Environmental Policy Act, 42 U.S.C. § 4321 *et. seq* ("NEPA"), the National Forest Management Act, 16 U.S.C. §1600 *et. seq* ("NFMA"), the Endangered Species Act, 16 U.S.C. § 1531 *et. seq* ("ESA"), the Administrative Procedure Act, 5 U.S.C. § 551 *et. seq* ("APA"), and their implementing regulations. As a result, the parties have filed the instant motions which the Court now considers.

**Standards of Review**

1)   <u>Summary Judgment</u>:

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. <u>Summers v. A. Teichert & Son, Inc.</u>, 127 F.3d 1150, 1152 (9th Cir. 1997). Federal Rule of Civil Procedure 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund, 882 F.2d 371, 374 (9th Cir. 1989) (citation omitted). Of course, when applying the above standard, the court must view all of the evidence in a light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Hughes v. United States, 953 F.2d 531, 541 (9th Cir. 1992).

2)      Administrative Review:

Compliance with NEPA, NFMA, and ESA is reviewed under the APA. See Northwest Ecosystem Alliance, et al. v. Rey, et al., ___ F.Supp.2d___, 2005 WL 1838612 (W.D.Wash. 2005) (citations omitted); 5 U.S.C. § 706(2)(A). A plaintiff who challenges a factual or technical decision of an administrative agency is required to show that the agency action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); Greenpeace Action v. Franklin, 14 F.3d 1324, 1331 (9th Cir. 1992); Nevada Land Action Ass'n v. United States Forest Service, 8 F.3d 713, 716 (9th Cir. 1993). "In determining whether an agency decision was arbitrary and capricious, the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Northwest Ecosystem, *supra* (citing Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989) (citation omitted)). An agency decision is arbitrary or capricious if: 1) the agency entirely failed to consider an important aspect of the issue; 2) the agency offered an explanation for its decision that was counter to the evidence before it; 3) the agency relied on factors that Congress did not intend for it to consider; or 4) the agency's decision is so implausible that it could not be ascribed to the product of agency expertise.[1]

---

[1] "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." MotorVehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983). The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Id. The agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." Id. (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). In reviewing that explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. (citing Bowman Transp. Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 285 (1975); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)).

Under this standard, the Court must grant substantial deference to the decisions and actions of federal agency defendants in adopting and implementing the certain agency activities. Kettle Range Conservation Group v. United States Forest Service, 148 F.Supp.2d 1107 (E.D.Wash. 2001). Accordingly, when an agency reaches a decision based on its expert review of the facts, a reviewing court should determine only whether the decision was "arbitrary or capricious." Id. (citing Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989)). In other words, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.' " Id. (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). "Within this narrow review, [the court] cannot substitute [its] judgment for that of the [agency], but instead must uphold the agency decisions so long as the agencies have 'considered the relevant factors and articulated a rational connection between the facts found and the choice made." Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944, 954 (9th Cir. 2003) (quoting Washington Crab Producers, Inc. v. Mosbacher, 924 F.2d 1438, 1441 (9th Cir. 1990)).

As to challenges raising predominately legal question, however, the Ninth Circuit has employed a "reasonableness standard." See Alaska Wilderness Recreation v. Morrison, 67 F.3d 723, 7272 (9th Cir. 1995) ("We find that it makes sense to distinguish the strong level of deference we accord an agency in deciding factual or technical matters from that to be accorded in disputes involving predominantly legal questions."). This "reasonable" standard of review applies only to those "rare" cases in which the agency's decision raises legal, not factual, questions. Id. Under this standard, to determine whether the agency has engaged in a "reasonably thorough discussion of the significant aspects of probable environmental consequences...[o]nce [we are] satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, [our] review is at an end." Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir. 1992) (quoting California v. Block, 690 F.2d 753, 761 (9th Cir. 1982)); see also Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1376 (9th Cir.1998) (noting "[t]he rule of reason analysis and the review for an abuse of discretion are essentially the same.").

**Discussion**

I.      NEPA Violations:

NEPA has two purposes:  "First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." Kern v. United States Bureau of Land Management, 284 F.3d 1062, 1078 (9th Cir. 2002) (citing Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97 (1983)). "NEPA does not mandate particular results, but simply describes the necessary process that an agency must follow in issuing an EIS," Westlands Water Dist. v. Dept. of Interior, 376 F.3d 853, 865 (9th Cir.2004) (internal quotation and citation omitted), thereby, establishing "'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." Kern, 284 F.3d at 1078 (citations omitted).

To that end, federal agencies are required to prepare an EIS prior to taking "major Federal actions significantly affecting the quality" of the environment. Id.; 42 U.S.C. § 4332(2)(C). "The EIS must provide the federal agencies with enough detailed information to decide whether to proceed with an action in light of the likely environmental consequences and to provide the public with such information so that the public can participate meaningfully in the process." Northwest Ecosystem, *supra* (citing Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519-20 (9th Cir. 1992)). The EIS must contain a reasonably thorough discussion of the significant probable environmental consequences and discuss the environmental impacts of the proposed action and alternatives to the proposed action. Id. (citation and quotation marks omitted).  Once the Court concludes that the agency took the requisite hard look, judicial review is at an end. Northwest Ecosystem *supra*. "Under NEPA's deferential standard, the reviewing court must defer to an agency's decision that is fully informed and well-considered, but it need not forgive a clear error of judgment." Id. (quoting Metcalf v. Daley, 214 F.3d 1135, 1141 (9th Cir.2000) (internal quotations and citations omitted)).

Plaintiff asserts the agencies failed to take a "hard look" at the environmental effects of the NLF Project by 1) relying upon WATBAL sediment model without disclosing its shortcomings; 2) failing to analyze the effectiveness of mitigation measures; 3) relying upon outdated and incomplete

MEMORANDUM DECISION AND ORDER - Page 5

data; 4) failing to properly conduct a cumulative effects analysis; and 5) failing to consider reasonable alternatives.  Such failures, Plaintiff argues, are in violation of both the APA and NEPA, rendering the USFS decision arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  In response, Defendants maintain the agencies have taken the requisite hard look at the environmental impact of the NLF project as required by NEPA.

      a)     <u>WATBAL Model</u>:

The WATBAL model is used to estimate a typical watershed response to a given forest practice, including the impact of sediment delivery as a result of such practices.  (FSEIS, p. 3-185).  Plaintiff contends the USFS' analysis is "highly dependent" upon WATBAL but the DSEIS fails to disclose its shortcomings and the model reaches conclusions inconsistent with the administrative record.  In particular, Plaintiff points to Robert Hickey's independent evaluation, contained in the record, which concluded that WATBAL consistently underestimates the amount of sediment reaching streams as a result of the model's failure to consider various factors including precipitation/storm intensity, surface erosion on undisturbed forests, road erosion rates, and road-related erosion mitigation.  (Dkt. No. 9, p. 5).  Plaintiffs also point to similar concerns voiced by the EPA and the Nez Perce Tribe.  (Dkt. No. 9, pp. 5-6).  Finally, Plaintiff challenges the model's "assumption" that sediment increases of 4-6% are "not measurable."  Defendants maintain the FSEIS properly documents the shortcomings of WATBAL and challenges the Plaintiff's independent evaluations, asserting the USFS judgment is entitled to deference.  In addition, Defendants point out that WATBAL is only one of many tools used to evaluate the project and the percentage increase is consistent with the Stipulation Agreement and other similar models.[2]

---

[2] Defendants also argue that Plaintiff has failed to exhaust the administrative remedies for many of their NEPA claims; in particular, the argument that WATBAL fails to calculate increased road traffic, underestimates sediment from roads, grazing, road construction, and channel erosion sources, and does not consider the proximity of streams.  Defendants argue these claims should be dismissed.  A party seeking judicial review of an administrative decision must first exhaust administrative remedies before seeking judicial review.  <u>See</u> <u>Lands Council</u>, 198 F.Supp.2d at 1240.  The Ninth Circuit has "recognized that claimants who bring administrative appeals may try to resolve their difficulties by alerting the decision maker to the problem in general terms, rather than using precise legal formulations."  <u>Idaho Sporting Congress, Inc. v. Rittenhouse</u>, 305 F.3d 957, 965 (9th Cir. 2002) (citing <u>Native Ecosystems Council v. Dombeck</u>, 304 F.3d 886, 900 (9th Cir. 2002).  "Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met and we must consider exhaustion arguments on a case-by-case basis.  <u>Id.</u>; <u>see also</u> <u>Native Ecosystems Council v. Dombeck</u>, 304 F.3d 886, 899-900 (9th Cir. 2002) ("Because plaintiffs raised the issue of Forest Plan amendment

MEMORANDUM DECISION AND ORDER - Page 6

NEPA requires that an EIS contain "high quality information and accurate scientific analysis." Lands Council v. Powell, 395 F.3d 1019, 1031 (9th Cir. 2005); see also Lands Council v. Vaught, 198 F.Supp.2d 1211, 1238 (E.D.Wash. 2002) (citing 40 C.F.R. § 1500.1(b) (1999)). "If there is incomplete or unavailable relevant data, the [EIS] must disclose this fact." Id. (citing 40 C.F.R. § 1502.22). The EIS is required to include a description of the methodologies it relies upon, setting forth any such shortcomings that are relevant in light of the environmental impacts the methodology is used to analyze. Lands Council, 198 F.Supp.2d at 1238. In Lands Council, the Ninth Circuit determined that "there was inadequate disclosure that the [WATSED] model's consideration of relevant variables is incomplete" and that "the Forest Service knew that WATSED had shortcoming, and yet did not disclose these shortcomings until the agency's decision was challenged on the administrative appeal." Lands Council, 395 F.3d at 1032.

In this case, WATBAL was used, in conjunction with other tools, to determine the findings of probable effects of the NLF Project. The DSEIS references readers to the "Technical Users Manual" for additional information on WATBAL. (DSEIS, p. 3-185) The DSEIS states that:

> Most of the proposed road construction/reconstruction and vegetative treatments were modeled in WATBAL. However, WATBAL is not capable of evaluating the overall benefits reaped from: 1) The obliteration of old roads; 2) The obliteration of temporary roads constructed specifically for this project; and 3) The removal of sediment traps from Walde and Pete King Creeks.

(DSEIS, p. 3-185). The DSEIS also contends that the model yields "very conservative" information because it assumes "that all temporary road construction would remain on the landscape, even though temporary roads are constructed and obliterated within the same year" and that every acre is harvested while in reality 20 to 30 % is within the PACFISH buffers and not harvested. Id. at pp. 3-185-86. The model also does not consider spatial context in terms of actual delivery distances required for sediment to reach water. Id. In sum, the DSEIS states:

> Models, such as WATBAL and WEPP, are designed to address and integrate a vast and complex number of conditions and organize the evaluation according to

---

procedures sufficiently for the agency to review these procedures and to conclude that the Forest Service complied with NFMA, we hold that the plaintiffs exhausted their administrative remedies as to the issues they raise before us."). Plaintiff maintains that the arguments raised in the administrative appeal provided notice of the concerns raised in this review. Having reviewed the record during the scoping phase and the administrative review and, in particular, the USFS' responses to numerous public inquiries, the Court agrees that the arguments presented to this Court were raised during the administrative process. Therefore, the Court will consider the arguments here.

> established rule sets. In the case of WATBAL, the rule sets were based on research, data and analysis collected locally. The models, however, also include simplifying assumptions, and do not include all possible controlling factors. Therefore, the use of models is to provide one set of information to the technical user, who, along with knowledge of the model and its limitations, other models, data, analysis, experience, and judgment integrates all those sources to make appropriate findings and conclusions.

Id. at p. 3-187. Despite the Defendants' suggestion to the contrary, the Court finds that the FSEIS conclusions are based heavily on the results of the WATBAL model. While other analytical tools may have been used, it is clear that WATBAL is the primary source for much of the data in the FSEIS.

As to Plaintiff's argument that independent analysis proves that WATBAL consistently underestimates the amount of sediment reaching streams, the USFS disputes the studies findings based on improper data. On this point, the Court defers to the USFS. See Marsh, 490 U.S. at 378; Lands Council, 198 F.Supp.2d at 1240 (recognizing the same argument as to WATBAL but deferring to the USFS experts because a different model, WATSED, was used in that case).

As to the Plaintiff's challenge to the 4-6% increase in sediment resulting in a "no measurable increase in sediment production," the Court finds the USFS' application of the percentage of increase is appropriate. The USFS points to Appendix K which discusses, in part, water quality/aquatic species and states that "All action alternative are consistent with the [CLF] Plan" and the Stipulation Agreement which allows the USFS to proceed with only those projects resulting in no measurable increases in sediment production in drainages not currently meeting CLF Plan standards. See also DSEIS, p. 1-6. The DSEIS notes that the "margin of error" is compatible with the DFC Fisheries Model, which was used in concert with WATBAL. DSEIS, p. 3-186. Further, the DSEIS itself points to the Forest Plan and its conclusion appears to be consistent with the Stipulation Agreement of the Forest Plan. Therefore, the Court defers to the USFS' scientific conclusion as to the appropriate percentage of increase deemed "not measurable." While the basis for the 4-6% measure is not entirely clear, the DSEIS discloses the measurable percentage and the ROD includes discussion of the measure such that it appears the USFS has taken a "hard look" at the percentage and its determination is entitled to deference by this Court.

While the technical arguments outlined by Plaintiff as to the WATBAL model are not alone troubling, when considered on whole with the broader concerns raised by Plaintiff relating to the limitations of WATBAL more serious problems arise.  The Ninth Circuit has made clear the requirement that environmental impact statements must disclose shortcomings of models in non-vague nor generalized terms. Plaintiff's arguments relating to sediment increases resulting from road conditions, obliteration, construction, and the like are not discussed in the DSEIS. The USFS points to portions of the record where it responded to these concerns but there is no inclusion in the DSEIS of any real discussion of the model's shortcomings in terms of increased sediment from roads, whether it be construction, obliteration, or the like.  The DSEIS does state that the model is not capable of evaluating the overall benefits reaped from 1) obliteration of roads, 2) obliteration of temporary roads, and 3) removal of sediment traps.  Because this disclosure speaks to the "benefits" from these three actions, presumably long-term benefits, it is unclear from the DSEIS what WATBAL does consider in terms of sediment impact as a result of road activity in the project area. What is clear, is that the impact of increased sediment on the listed species in the CLF is a significant concern in evaluating the project's impact on the endangered species.  Considering the weight with which the USFS placed upon the results of the WATBAL model and the obvious importance of analyzing the NLF Project's effect on increased sediment in the project areas, the Court finds the lack of anything more than generalized conclusions regarding the WATBAL model's accounting, or lack thereof, for the sediment impact from road activities violates the requirements of NEPA. The lack of a discussion of the model's consideration of relevant variables precludes the ability of others to test the accuracy or reliability of the model.

b)      Mitigation Measures:

Plaintiff argues the USFS failed to take the necessary hard look at the mitigation measures in the project by summarily relying on the effectiveness of PACFISH buffers without any analysis of their effectiveness or the impact of the buffers from prior activities or consideration of alternative mitigation schemes.  In particular, Plaintiffs points to the loss of buffers as a result of prescribed burning from the project and notes the lack of discussion as to the effect of this loss on the effectiveness of PACFISH.  Similarly, Plaintiff identifies the proposal of helicopter landing areas

are within PACFISH buffers but the lack of any analysis regarding the impact this action would have on the project area.  Defendants maintain they took the necessary hard look at the numerous mitigation measures employed in this project including PACFISH, canopy retention, buffering guidelines for timber harvest, BMP implementation, and staggered project activities.  Furthermore, Defendants assert that PACFISH buffers were throughly analyzed in a separate NEPA process and adopted as an amendment to the CLF Plan.  (Dkt. No. 27 p. 9, n. 7).  Defendants state their reliance upon the PACFISH buffers to mitigate sediment deposits from the project activities was based upon "numerous studies" and the effectiveness of the buffers was analyzed in the Monitoring of Best Management Practices.  Further, Defendants maintain any impact from past management activities was disclosed in a map detailing past harvests and in the WATBAL baseline.  Finally, Defendants contend the effect of prescribed burning on the buffers and the helicopter landing pads were considered and discussed as to all the mitigation alternatives.

The DSEIS discusses the effectiveness of PACFISH buffers sufficiently such that the Court finds the USFS did take a hard look at their impact.  (DSEIS, pp. 3-184-85, 3-192).  Likewise, the Court finds the USFS properly considered and employed various mitigation measures in the NLF Project to reduce the sediment impact on the waterways in the project area.  (DSEIS, pp. 3-190-94).

As to the effect of prescribed burning on PACFISH buffers and the construction of helicopter landings, the USFS points mainly to Appendix B of the DSEIS for its discussion of the effectiveness of mitigation measures employed to address these concerns.  The Appendix rates the effectiveness of  the mitigation measures for these actions as "high" and notes the NMFS' concurrence in this conclusion and past projects successful use of similar measures.  (DSEIS, pp. B-1-2).  Appendix B is a table of summary conclusions from both the USFS and NMFS but does not provide real analysis of the mitigation measures.  The DSEIS relies heavily upon the implementation of PACFISH and its requirement that there be no vegetative removal or soil disturbance activities within 300 feet of perennial fish bearing streams and 150 feet of smaller non-fish bearing perennial streams.  (EIS, Appendix I-13).  The proposed helicopter pads and prescribed burns are proposed to occur withing the PACFISH buffers.  Such a modification to the PACFISH buffer areas "usually requires completion of a Watershed Analysis to provide the ecological basis for the change" but that no such

analysis may be necessary "where stream reach or site-specific data support the change."  (EIS, Appendix I-13).   PACFISH recognizes that implementation of USFS projects may require disturbances within the buffer but notes that "Specific plans will need PACFISH evaluation to assess the consequences" and the rational supporting the changes and the effects of such changes should be documented. (EIS, Appendix, I-13). The effectiveness of maintaining these buffer zones without a helicopter pad or burns is characterized as "high."  (EIS, Appendix I-9-10).   There is no corresponding characterization where the buffer zones are compromised by the activities proposed here.  The DSEIS' own discussion of the two helicopter landings in the North Lochsa Face concludes that  "Activity at both sites meet PACFISH requirements protecting water quality.  Use of the sites...would have no detrimental impact to the outstandingly remarkable values of the river corridor."  (DSEIS, p. 3-293).

        While the DSEIS generally contains many references to the effectiveness of PACFISH buffers and relies heavily upon this mitigation tool, although also acknowledging the use of other mitigation devices, the discussion justifying the proposed infringement on the PACFISH buffers is noticeably brief and conclusory.  The USFS conclusions cite support from the conclusion of the NMFS' opinion which was based upon the USFS' biological assessment. The biological assessment, however, also does not evaluate the effectiveness of the measures employed to mitigate any impact from the landing pads or the prescribed burns but, instead, identifies the same proposed actions in Appendix B without any further discussion. (Biological Assessment, Doc. 621, pp. 7-8).  An endless circle of reliance without revealing any analysis.  Thus, neither the USFS nor the NMFS has provided a discussion of the effectiveness of the mitigation efforts proposed for the prescribed burns and helicopter pads located in the buffer zones.  Such a discussion and analysis is contemplated by PACFISH when a proposed activity will disturb a riparian area.  (EIS, Appendix I-13).  Given the heavy reliance by all of the agencies on the application of PACFISH as a major mitigation measure, more discussion is required where those mitigation efforts are to be altered as proposed by these activities in the buffer zones.

        The analysis of the past management activities in the project area is also lacking.  The USFS points to a map "detailing location, scope, and type of past harvesting" and baseline information for

MEMORANDUM DECISION AND ORDER - Page 11

WATBAL to evidence its consideration of past management activities.   The map of past management activities does not qualify as analysis or discussion of the impact of those activities in light of the proposed project actions.  Likewise, the WATBAL model is not a mitigation measure but, as noted above, a means of predicting potential sediment impact as a result of project activities. Inclusion of past activities into the model does not provide a discussion of the past activities impact on the effectiveness of the mitigation measures adopted for this project.  It also seems contradictory for the USFS to point to the WATBAL model's consideration of past activities in this instance in light of the fact that WATBAL does not consider PACFISH buffers.  (DSEIS, p. 3-185).  Thus, even if past activities are included in WATBAL, the model does not measure the impact of those activities nor analyze the effectiveness of mitigation measures.   The USFS has argued WATBAL's conclusions are conservative because any mitigation efforts would reduce the model's predictions. While this may very well be the case, it does not address the problem raised in this argument that the USFS failed to consider the impact of past management activities on the effectiveness of the proposed mitigation measures. Thus, the USFS violated NEPA by failing to take the necessary hard look before reaching its conclusions on this point.

        c)        Outdated and Incomplete Data:

        Plaintiff challenges the data used by the USFS in its DSEIS as outdated and incomplete.  In particular, they point to the lack of analysis dated after the major flood/landslide events of 1995/1996 and the outdated information relating to the aquatic conditions in Pete King, Canyon, Deadman, and Fish Creeks.  Defendants assert the data utilized in its DSEIS was not outdated and points out that the SEIS did consider the 1995/1996 storm events.  Defendants concede that post-storm surveys were not completed for Fish Creek, as they were for Pete King and Deadman watersheds where most of the landslides occurred, because Fish Creek was largely not impacted by the events.  Further, Defendants note that Plaintiff has only identified the year of the data in the DSEIS but not demonstrated that such data is unreliable.  In response, Plaintiff argues "Without complete or current watershed data, it is unclear how Defendants could determine what impacts, direct or cumulative, this massive project would have on aquatic resources."  (Dkt. No. 33, p. 8).

"The agency must be alert to new information that may alter the results of its original environmental analysis...." <u>Northwest Ecosystem Alliance, et al. v. Rey, et. al.</u>, ____ F.Supp.2d ___ 2005 WL 1838612 (W.D. Wash. 2005) (quoting <u>Friends of the Clearwater v. Dombeck</u>, 222 F.3d 552, 557 (9th Cir. 2000)). "NEPA requires that the Environmental Impact Statement contain high-quality information and accurate scientific analysis." <u>Land Council</u>, 395 F.3d at 1031 (citing 40 C.F.R. § 1500.1(b)). The Ninth Circuit has recognized the need for agencies to rely upon relevant up-to-date data in drawing their conclusions while at the same time acknowledging that all data relied upon by the agency need not be immediate. <u>See</u> <u>Lands Council</u>, 395 F.3d at 1031.  Further, it is true that "a federal agency has a continuing duty to gather and consider new information in assessing the environmental impact of its actions." <u>Coeur d'Alene Lake v. Kiebert</u>, 790 F.Supp. 998, 1009 (D.Idaho 1992) (citing 42 U.S.C. § 4332(2)(A), (B) (citations omitted) (discussing whether a supplemental EIS is necessary)).  However, "Administrative consideration of evidence ... always creates a gap between the time the record is closed and the time the administrative decision is promulgated." <u>Mid States Coalition for Progress v. Surface Transp. Bd.</u>, 345 F.3d 520, 551 (8th Cir. 2003) *rehearing and rehearing en banc denied* (Jan 30, 2004) (quoting <u>ICC v. Jersey City</u>, 322 U.S. 503, 514 (1944)).  "This is especially true if the issues are difficult, the evidence intricate, and the consideration of the case deliberate and careful." <u>Id.</u>  Thus, the determination as to the reliability of given data should be considered as of the time the agency issued its EIS unless there exists new data significantly changing the conclusions reached in the EIS which demand the issuance of a supplemental EIS.

The research for the NLF Project began more than seven years ago.  The initial Final EIS was issued in June of 1999 but in July of 2000 the Regional Forester directed that a Supplemental EIS be issued.  (DSEIS, p. 1-3).  The Draft Supplemental EIS was later issued in January of 2002, and the Final Supplemental EIS was delivered in November of 2002.  Needless to say, the compiling of data and information on this project has been ongoing for some time.  Regardless, the fact remains that the USFS must provide the most accurate and detailed scientific data available upon which to base its decisions.  Undoubtedly, the most significant data challenged by Plaintiff is that relating to the 1995/1996 storm events.  A review of the records of decisions and the DSEIS, however, reveals

MEMORANDUM DECISION AND ORDER - Page 13
05ORDERS\NezPerce_sj.WPD

that the USFS did consider these events in reaching their decision. (DSEIS 3-164 - 176, 3-221-222). The storm events are discussed and analyzed throughout the DSEIS. As to the Pete King Creek data, the major report was completed in 1998 which was only four years prior to the issuance of the DSEIS. Data for the Lochsa was compiled, to some extent, after the 1995/1996 storm events as discussed in the DSEIS. (DSEIS, 3-262-267). The Court concludes the data relied upon by the USFS was not stale or outdated.

>        d)        <u>Cumulative Effects Analysis</u>:

Plaintiff argues the USFS failed to adequately disclose and analyze cumulative effects of past, present, and reasonably foreseeable future actions both in the NLF Project area and in adjacent areas that may impact the migratory nature of the listed steelhead and their habitat. To the extent the DSEIS does mention other actions, Plaintiff alleges, such references lack any real discussion or analysis. Defendants maintain it conducted an "extensive cumulative effects analysis that included a detailed description of past timber harvest, roading, wildfire, and landslide events in the Project area." (Dkt. No. 27, p. 13).[3]

"Federal regulations do not explicitly require an EIS to include a discussion of cumulative impacts, but they do direct agencies to consider cumulative impacts in determining the scope of an EIS." <u>Kern</u>, 284 F.3d at 1076 (citing <u>Edwardsen v. United States Dep't of Interior</u>, 268 F.3d 781, 786 (9th Cir. 2001) and 40 C.F.R. § 1508.25(a)(2)). "In determining the significance of a proposed action, an agency must consider whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." <u>Id.</u> "Cumulative impact" is defined as: the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. 40 C.F.R. § 1508.7.

---

[3] Defendants maintain this issue was not raised during the administrative process and, therefore, should be dismissed. In particular, Defendants note that the generalized allegations regarding cumulative impacts did not provide the USFS notice of any alleged failure to analyze cumulative impacts of water quality from sedimentation due to past timber harvest, road traffic, or impacts upon the soil. The Court, however, finds these arguments regarding impacts were raised in the administrative process sufficient to provide the USFS notice. Further, the Regional Forester directed for the issuance of a supplemental EIS specifically to clarify the environmental analysis related to road obliteration effects. (DSEIS, p. 1-3).

MEMORANDUM DECISION AND ORDER - Page 14
05ORDERS\NezPerce_sj.WPD

Further, the EIS must also include a "useful analysis of the cumulative impacts of past, present and future projects" which analyzes the combined effects of the actions in sufficient detail to be "useful to the decision-maker in deciding whether, or how, to alter the program to lessen cumulative impacts." Churchill County v. Norton, 276 F.3d 1060, 1079 (9th Cir. 2001) (citing City of Carmel-by-the-Sea v. United States Dep't of Transp., 123 F.3d 1142, 1160 (9th Cir. 1997) (quoting Muckleshoot Indian Tribe, 177 F.3d at 809-10). Detail is therefore required in describing the cumulative effects of a proposed action with other proposed actions. Id. (citations omitted).

Defendants point out that the DSEIS provides information regarding past timber harvests as to each watershed and that a more detailed recitation of past activities is "impractical" and unnecessary for this project. (Dkt. No. 27, pp. 14-15 (citing DSEIS, 3-202, 3-239, 3-247)). In addition, Defendants note that the DSEIS detail the impacts of the 1995/1996 storm events and past wildfires on the landscape and attached maps quantify the effects of past timber sales. Id. The WATBAL model, Defendants assert, also considered past timber harvest and road building in its analysis and through that model the USFS considered the cumulative effects of all past, ongoing, and proposed timber harvesting and road construction. Id.

There is mention of past, present, and reasonably foreseeable activities in the DSEIS. For instance the Cumulative Effects on Soils and Erosional Processes, DSEIS 3-177-178, refers the reader to the description of the existing condition in Chapter Three and then lists present timber sales, and two reasonably foreseeable actions within the analysis area. See also DSEIS 3-43. This discussion alone is insufficient. The Court has attempted to locate more detailed discussion as to the cumulative effects without success. The comments that were discovered were conclusory statements regarding the net acreage harvested or burned with nothing more, let alone any discussion of the impact as a result of the prior activities. (DSEIS, 3-218, 3-221, 3-232, 3-239, 3-247, 3-251). The identical discussions of future actions in Pete King Creek, Canyon Creek, Deadman Creek which the DSEIS predicts will not increase sediment or peak flows but which will require a future environmental analysis are conclusory but appears to be adequate. For Deadman Creek, the DSEIS briefly states "Although logging and roading activities have produced additional sediment and

runoff, the stream is being managed below its geomorphic threshold as stream integrity and equilibrium are maintained." (DSEIS, 3-240).

The impact of prior harvests and fires is an important factor in determining the effect of this project on the aquatics in the project area. Without this consideration there is no means by which the agencies can identify an accurate baseline nor accurately appreciate the existing conditions of the project area. In fact because the Regional Forester directed the preparation of the SEIS to consider road obliteration effects, it seems odd that the DSEIS does not include any discussion of the effects of the roads constructed in the area from past timber harvesting let alone the lack of information regarding the harvests themselves. The DSEIS fails to provide a necessary discussion regarding the past, present, and foreseeable future actions on the listed species.[4]

The cumulative effects analysis of the Lochsa River, however, is appropriate. (DSEIS, 3-262-267). This discussion includes an actual discussion of the past, present, and foreseeable future actions in the area in addition to consideration of the impact those activities have had on the watershed area. Likewise, the discussion of the North Lochsa Face is sufficient. (DSEIS, 3-296-297).

    e)     <u>Range of Alternatives</u>:

Plaintiff argues the USFS violated NEPA by failing to consider a restoration-focused alternative. Defendants contend the USFS evaluated the proposed alternative but ultimately eliminated it because it did not meet the purpose and needs for the proposed action. In particular, Defendants point out that the restoration-focused alternative does not address the needs of reducing biomass and fuel accumulations nor contributing timber products to the economy.

"NEPA requires agencies to 'rigorously explore and objectively evaluate all reasonable alternatives' to a proposed plan of action that has significant environmental effects." <u>Natural Resources Defense Council et. al. v. United States Forest Service et al.</u>, ____ F.3d ____ 2005 WL 1845097 *11 (9th Cir. Aug. 5, 2005) (quoting 40 C.F.R. § 1502.14(a) (2000)). Failure to consider

---

[4] While Defendants dispute the necessity of the discussion of certain foreseeable future actions (Dkt. No. 27, p. 16), the DSEIS does note certain harvesting activities and provides a quality analysis of the impact of those sales in terms of the cumulative effect on scenic resources (DSEIS, 3-279) but there is no similar discussion of their effect on aquatics.

MEMORANDUM DECISION AND ORDER - Page 16
05ORDERS\NezPerce_sj.WPD

viable alternatives renders the environmental impact statement inadequate, violating NEPA.  Id. (citation omitted); 36 C.F.R. § 219.12(f)(1) (2000) ("Alternatives shall be distributed between the minimum resource potential and the maximum resource potential to reflect the extent practicable the full range of major commodity and environmental resource uses and values that could be produced from the forest.").  An agency, however, is not required to consider every possible alternative.  See Westlands Water Dist.v. Department of Interior, 376 F.3d 853, 871-72 (9th Cir. 2004) (citing Kootenai Tribe v. Veneman, 313 F.3d 1094, 1122 (9th Cir.2002) ("It would turn NEPA on its head to interpret the statute to require that [an agency] conduct in-depth analyses of ... alternatives that are inconsistent with the [agency's] policy objectives.") (citation omitted)).  "The 'range of alternatives that must be considered in the EIS need not extend beyond those reasonably related to the purposes of the project.'" Id. at 868 (citations omitted).  "The touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation."  Id. (citation omitted).  Agencies must provide a reason for elimination of a proposed alternative from detailed study.  See 40 C.F.R. § 1502.14.

The Court finds the USFS properly addressed its decision to eliminate the restoration-focused alternative from consideration.  The NLF Project's purposes are to manage forest vegetation to restore ecological structure, function, processes and composition; improve forest health; reduce risk of intense wildfire; control noxious weeds; improve aquatic conditions; improve growing conditions and resiliency in forest stands; support maintenance of desired vegetative characteristics in the Lochsa Research Natural Area; and contribute timber products to the economy. (DSEIS, 1-1). The Court gives deference to the agency in identifying these purposes.  See Westlands Water Dist.v. Department of Interior, 376 F.3d 853, 871 (9th Cir. 2004).  The USFS evaluated a range of alternatives including the no-action alternative. Several other alternatives, including the restoration-focused alternative, were not considered as they did not meet the purposes identified for the project. The alternatives considered in detail for the NLF Project fostered informed decision-making and public participation.  The considered alternatives proposed a varying array of ranges for achieving the projects purposes. (DSEIS, 2-33-38). Further, the USFS properly responded with its reasoning

for not considering the proposed restoration-focused alternative. (DSEIS, 2-9). The Court denies Plaintiff's motion for summary judgment and grant's Defendants' motion on this point.

II.      NFMA Violations:

The National Forest Management Act, 16 U.S.C. §§ 1600 et seq., sets forth a statutory framework for the management of our national forests. Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1061 (9th Cir. 2002). It provides a two-step process for forest planning. Native Ecosystems Council v. Dombeck, 304 F.3d 886, 897 (9th Cir. 2002) (citing Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1376 (9th Cir. 1998)). First, the Forest Service must develop a Land Resources Management Plan (also known as a forest plan) for the entire national forest lands. Native Ecosystems, 304 F.3d at 897 (citing 36 C.F.R. § 219.10(a) (1996); see also Neighbors, 303 F.3d at 1061. Implementation of the forest plan then occurs at the site-specific level where the Forest Service is required to ensure the forest is managed in compliance with the forest plan. Id. (citing 36 C.F.R. § 219.10(e)). Specific projects or activities in the forest, including timber sales, must be analyzed by the Forest Service and determined to be consistent with the governing forest plan. Id. (citing 16 U.S.C. § 1604(I) (2000)). Through both steps in this process, NFMA imposes substantive constraints on the management of forest lands. Id. (citing Neighbors, 137 F.3d at 1376 and 36 C.F.R. § 219, et seq. (2001)). The forest plan applicable to this case is the CNF Plan and the Stipulation Agreement resulting from litigation on the application of the CLF Plan.

Plaintiff alleges the USFS violated NFMA by proposing activities in watersheds not currently meeting the standards of the CNF Plan. The arguments points to the management goals for Pete King Creek, Canyon Creek, Deadman Creek, and Glade Creek which are to be managed as either "no effect" streams or "high fishable" streams but which, Plaintiff argues, are currently not meeting sediment standards under the CNF Plan.[5] Plaintiff challenges the "no-measurable increase" standard

_____

[5] Fish Creek is designated as a "no effect" stream to be managed at a minimum of 100 percent of biological potential. The "no effect" standard allows for 45% sediment production over natural and means "no sustained, measurable adverse changes over time due to management-caused effects...." (DSEIS, p. 3-182). Pete King, Canyon, Deadman, and Glade Creeks are all "high fishable" streams to be managed at a minimum of 80 percent biological potential. "High fishable" means maximum short-term reduction of water quality that is still likely to maintain a fish habitat potential that can support an excellent fishery relative to the stream system's natural potential, and that will

MEMORANDUM DECISION AND ORDER - Page 18

used by the USFS in evaluating the sediment of these streams in the DSEIS; again challenging the 4-6% WATBAL model and the reliance upon PACFISH buffers which Plaintiffs maintain are arbitrary and capricious assumptions.  Defendants maintain that their expert scientific analysis of these watersheds is consistent with the CLF Plan and the Settlement Agreement for the aquatic standards.  In addition, Defendants again note that the reliance upon the PACFISH buffers is reasonable in light of the proven effectiveness of their use as a mitigation measure.  Further, Defendants point out that the sediment predictions do not take into account the beneficial effects of the project which will further improve water quality.

The Stipulation Agreement for the CNF states that "only those projects that would result in no measurable increase in sediment production in drainages currently not meeting Forest Plan standards."  (DSEIS, p. 3-182).  Thus, each watershed is evaluated to determine whether it is consistent with the CLF Plan standards and, if the standards are not met, then the project is evaluated to determine if it results in "no measurable increase."  No measurable increase means the activity cannot produce measurable quantities of sediment, or that an equivalent or greater amount of sediment would be mitigated through restoration activities in the watershed.  Id.  USFS asserts the WATBAL model proves the project meets the no measurable increase standard and, alternatively, the mitigation measures employed would satisfy the required standard.

As determined above, the USFS failed to take the requisite hard look when relying upon WATBAL and PACFISH under NEPA.  Likewise, their reliance here on the same criteria for compliance with the CLF Plan is in error.  Plaintiff's motion for summary judgment on the NFMA claim is granted, Defendants' motion is denied.

III.   ESA Violations:

Under the Endangered Species Act, federal agencies have an obligation to insure that any action it undertakes is "not likely to jeopardize" the continued existence of any endangered or threatened species or their critical habitats.  See 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.15(a) (requiring each agency to determine how to proceed "in light of its section 7 obligations and the Service's biological opinion").  An agency action is likely to "jeopardize" a protected species if the

provide the capability for essentially full habitat recovery over time.  Id.

MEMORANDUM DECISION AND ORDER - Page 19
05ORDERS\NezPerce_sj.WPD

action reasonably would be expected to cause an appreciable reduction in the likelihood of the survival and recovery of a protected species by reducing the reproduction, numbers or distribution of that species. <u>See</u> 50 C.F.R. § 402.02 (1999). "Before initiating any agency action in areas containing protected species, the agency must (1) independently determine whether its action 'may affect' a protected species or its habitat or (2) initiate a formal consultation with the Service having jurisdiction over the species...." <u>Tinoqui-Chalola Council of Kitanemuk and Yowlumne Tejon Indians v. U.S. Dept. of Energy</u>, 232 F.3d 1300, 1306 (9th Cir. 2000) (citation omitted). "If the agency determines its proposed action 'may affect' protected species or habitat, the agency is required to initiate formal consultation." <u>Id.</u>; 50 C.F.R. § 402.14(a) (1999). "An agency may avoid formal consultation only when it has determined the proposed action is unlikely to adversely affect the protected species or habitat and the [agency] concurs with that determination." <u>Id.</u>; 50 C.F.R. § 402.14(b) (1999). The ESA requires that the biological opinion and agency action be based on the best scientific and commercial data available. <u>See</u> 16 U.S.C. § 1536(a)(2); <u>Selkirk Conservation Alliance</u>, 336 F.3d at 954 (citation omitted).

In this case, the USFS sought consultation from two federal agencies for the NLF Project: the National Oceanic and Atmospheric Administration Fisheries' ("NOAA")/National Marine Fisheries Service ("NMFS")[6] and United States Fish and Wildlife Service's ("FWS"). Plaintiff alleges the consulting agencies failed to satisfy their obligation under § 7(a)(2) and thus acted arbitrarily and capriciously, in violation of the APA. <u>See</u> 5 U.S.C. § 706(2)(A); <u>Am. Mining Cong. v. EPA</u>, 965 F.2d 759, 763 (9th Cir.1992). Plaintiff challenges certain opinions of these agencies: 1) NOAA's 1998 Northwest Forest Plan Biological Opinion ("1998 NOAA BiOp") and the 1999 NOAA BiOp for the NLF Project ("1999 NOAA BiOp") which determined the NLF Project is not likely to jeopardize the continued existence of Snake River Basin steelhead and fall chinook, or result in the destruction of critical habitat and 2) the FWS 1998 Biological Opinion ("1998 FWS BiOp") and Concurrence Letter which agreed with the USFS' biological assessment that the NLF

---

[6] While Plaintiff's briefing refers to the NOAA and the Defendants refer to the NMFS, the biological opinions to which both parties refer are one in the same. NOAA is an agency within the United States Department of Commerce. NMFS is a subagency of NOAA. NMFS recently changed its name to NOAA Fisheries. The Court will refer to the opinion as the "NOAA BiOp" using the corresponding date for each document respectively.

MEMORANDUM DECISION AND ORDER - Page 20
05ORDERS\NezPerce_sj.WPD

Project is not likely to adversely affect Columbia River bull trout and bull trout habitat.  Plaintiff asserts the agencies' opinions are arbitrary and capricious, violating the Endangered Species Act ("ESA") and the National Forest Management Act ("NFMA").  In their reply brief, the Plaintiff contests the substance of the agencies' opinions, arguing they failed to fully consider the NLF Project impacts including project-level considerations and based the decisions on incomplete data and failed to use the best available science.  The defense maintains that both opinion documents properly analyzed the NLF Project and are properly supported by the record.[7]  As to Plaintiff's argument regarding best evidence, the Court notes that the BiOps must be considered in the appropriate context.  These documents were both complied in 1998.  Their reliance upon data and information completed in 1995 or otherwise was not necessarily stale at the time these BiOp's were completed.     As to the NOAA BiOp, Plaintiff argues the decision failed to analyze the effects of a project-level action against the programmatic requirements included in its biological opinions on PACFISH.  Asserting the NOAA BiOp failed to analyze the site-specific projects for compliance with PACFISH but instead simply based its opinion on the assumption that PACFISH would be implemented on the project level.  Likewise, as to the FWS BiOp, Plaintiff argues the FWS' concurrence is arbitrary and capricious because the no jeopardy opinion is based on the project's application of PACFISH but contains no analysis of the projects consistency with PACFISH.  Defendants maintain neither the NOAA nor FWS is required to assure PACFISH compliance as asserted by Plaintiff.

In support of its position, Plaintiff points to <u>Pacific Coast Fed'n of Fisherman's Ass'ns v. NMFS</u>, 265 F.3d 1028 (9th Cir. 2001) and <u>Cascadia Wildlands v. FWS</u>, 219 F.Supp.2d 1142 (D.Or. 2002).  In <u>Pacific Coast</u>, plaintiffs sought injunctive relief against proposed timber sales in the Umpqua River Basin challenging the NMFS biological opinions finding "no jeopardy" from the proposal on cutthroat trout and coho salmon.  The Ninth Circuit made clear that the NMFS is not required to assure or enforce ACS consistency on a given project but, instead, to determine whether

---

[7] Defendants reply asserts the substantive argument was not raised by Plaintiff in its opening brief on summary judgment and should be stricken.  Having reviewed the briefing the Court finds the argument was raised, at least to some extent, and further, that the Defendants are not prejudiced by the Court's consideration of this argument since they had an opportunity to address it both in their memorandum in support/opposition (Dkt. No. 27, p. 29) and in their reply brief (Dkt. No. 37, p. 18-20), which was filed subsequent to Plaintiff's reply brief.

MEMORANDUM DECISION AND ORDER - Page 21
05ORDERS\NezPerce_sj.WPD

"a project is likely to adversely affect a listed species." Id. In making this determination, the court permitted NMFS to base its "no jeopardy" finding on the assumption that the project would comply the Aquatic Conservation Strategy ("ACS") guidelines as required by the Northwest Forest Plan ("NFP"). In making this assumption, however, the Ninth Circuit concluded that NMFS must analyze ACS consistency for the project. Pacific Coast, 265 F.3d at 1035.

Subsequently, in Cascadia, the District of Oregon dealt with a motion for temporary restraining order and/or injunction of four proposed timber sales in the Willamette National Forest where plaintiff challenged the FWS biological opinion finding no jeopardy to bull trout. Cascadia, 219 F.Supp.2d at 1148. Plaintiffs in that case argued that because the FWS biological opinion based its "no jeopardy" opinion on the condition that the timber projects meets ACS objectives, the FWS must insure the projects comply with ACS. The court, following the reasoning in Pacific Coast, found that although the FWS was not in the role of enforcing ACS consistency, because FWS equated ACS consistency with its "no jeopardy" finding it was appropriate for the court to consider whether the FWS properly analyzed the projects consistency with ACS. Id. at 1149. Because inconsistencies appeared to exist between the ACS and the FWS opinion, the court determined that "serious questions" existed as to whether the FWS acted arbitrarily and capriciously in failing to analyze the specific timber sales to determine whether they are consistent with ACS objectives and, thus, granted the injunction. Id. at 1149.

Defendants in this case seek to distinguish these cases arguing that they are unique because they involve the NFP which requires application of ACS; whereas, in this case, the CNF is not subject to the NFP. This distinction misses the point of these cases. The two decisions hinge on the FWS' reliance that the ACS guidelines would be applied in making its "no jeopardy" finding; not the fact that the NFP had adopted the ACS guidelines. Because of that reliance the court deemed it appropriate to review whether the FWS biological opinion analyzed the project's consistency with the guidelines upon which it relied in reaching its conclusion.

The instruction to be drawn from these cases is that where an agency's biological opinion equates its findings upon the application of a certain set of guidelines the agency must analyze the project's consistency with those guidelines. While in this case it is true that the NFP requirements

MEMORANDUM DECISION AND ORDER - Page 22
05ORDERS\NezPerce_sj.WPD

are not be applicable to the CNF, where an agency relies upon the application of PACFISH to the NLF Project in their biological opinion findings, such reliance is akin to circumstances in <u>Pacific Crest</u> and <u>Cascadia</u> which necessitated agency analysis. The agency cannot simply rest its opinion upon an assumption but must, instead, determine whether the guidelines applications are consistent with the proposed project activity and, as a result, analyze the projects impact upon listed species. It would run contrary to the purpose of these protective statutes to allow consulting agencies to base their conclusions upon an assumption without any analysis as to the impact and/or effectiveness of that assumption. Such conclusions are little more than empty promises. Incorporating this framework here, the Court has reviewed the agency opinions and finds as follows.

A)    NOAA BiOp:

Plaintiff challenges the opinion of NOAA concluding that the NLF Project "is not likely to jeopardize the continued existence of Snake River steelhead and fall chinook salmon, or result in the destruction or adverse modification of proposed/designated critical habitat." (1999 NOAA BiOp). Plaintiff asserts NOAA's opinion fails to analyze the NLF Project for consistency with PACFISH or discussion of other relevant project impacts on stream habitat. Defendants argue NOAA is not required to evaluate the project for consistency with PACFISH.

Plaintiff's arguments quote from two documents: 1) the 1998 NOAA BiOp relating to the continued implementation of 18 Land Resource Management Plans ("LRMP") in the Upper Columbia River Basin and Snake River Basin and 2) the 1999 NOAA BiOp on the NLF Project. The 1998 NOAA BiOp, Plaintiff argues, expressly based its no jeopardy conclusion on the assumption that PACFISH and nine other recommendations would be implemented at the project level in the future. Because of this reliance on the application of PACFISH at the site-specific level, Plaintiff asserts, the 1999 NOAA BiOp is required to analyze and discuss whether the NLF Project complies with PACFISH. Defendants maintaining NOAA is not required to police the USFS' compliance with PACFISH but, instead, its duty is to determine whether the proposed action is likely to jeopardize the continued existence of listed species; which Defendants contend was done in this case.

The 1998 NOAA BiOp undeniably detailed the need for the implementation of PACFISH guidelines and outlined mechanisms for such implementation and for establishing interim

management direction for the continued implementation of LRMP's.  The opinion's environmental baseline details a dim picture of the prospect of survival of the listed species and habitat in the area. Discussed throughout the BiOp is the necessity for consistent implementation of PACFISH and, in order to achieve that, the need for accountability and monitoring at the project level.  (1998 NOAA BiOp, p. 23, 53-59).  The 1998 NOAA BiOp, thus, concluded that if acting agencies implemented the requirements and guidelines detailed in the BiOp at the project-level, such projects are not likely to jeopardize listed species or adversely modify critical habitat.  (1998 NOAA BiOp, p. 58) ("This conclusion is expressly based on the expectation that each element of PACFISH and the nine recommendations will be fully implemented....  Any departure from full implementation would lead [NOAA] to a different conclusion as to the effects of the action....").  Because the no jeopardy conclusion is clearly based on the implementation of PACFISH guidelines, the subsequent project level opinions of NOAA must necessarily discuss and analyze whether proposed agency actions adhere to PACFISH.

While the Defendants strongly oppose this reasoning and assert the <u>Pacific Coast</u> and <u>Cascadia</u> cases are distinguishable, the Court has concluded above that the opposite is true.  To allow an agency to issue an opinion premised upon the need for consistent implementation of certain guidelines, detailing mechanisms and strategies for such application, and then to later allow the same agency to issue an opinion which does not itself analyze and discuss whether a subsequent site-specific action proposes to apply those mechanisms is wholly inconsistent.  Therefore, the Court must determine whether when reaching its conclusion the 1999 NOAA BiOp considered whether the NLF Project would incorporate the previously detailed strategies for implementing PACFISH.

The 1999 NOAA BiOp cover letter states "Given this is an expansive project with numerous mitigation measures, full implementation of mitigation measures and attached terms and conditions will be very important to ensure the amount and extent of take are not exceeded."  (1999 NOAA BiOp).  The opinion generally determines that the project will have a detrimental affect on the listed species in the short-term, in particular the increased sediment delivery, but that the long-term impacts will be beneficial to listed species.  (1999 NOAA BiOp, pp. 5-9).  The opinion includes some discussion of the "mitigation measures" and brief mention of PACFISH itself.  (1999 NOAA

BiOp, p. 1 n. 1, p. 7, 9).  While the opinion does not include an outright discussion of the projects compliance with PACFISH, it generally concludes that the "mitigation measures" of the project will properly reduce any adverse short-term effects of the projects actions and result in neutral or beneficial long-term effects.  (1999 NOAA BiOp, p. 9).  Although somewhat weak, the Court finds this discussion is not arbitrary and capricious.  The 1999 NOAA BiOp considered PACFISH application in its evaluation of the NLF Project and based its conclusion on the projects application of PACFISH.  (1999 NOAA BiOp, p. 9).  While not an ideal substantive analysis, the Court cannot say NOAA acted arbitrarily and capriciously.

    B)    FWS BiOp and Concurrence Letter:

    In August of 1998 the FWS completed its final biological opinion ("1998 FWS BiOp") addressing effects to the bull trout population from the continued implementation of USFS LRMP and BLM Resource Management Plans as amended by INFISH and PACFISH.  (Document No. 627).[8]  The FWS cover letter notes the 1998 FWS BiOp "deals with implementation of an ecosystem approach at the plan-level, this consultation does not address the specific effects of individual ongoing or future actions, therefore no incidental take authorization has been provided through this opinion."  (Document No. 627).  The 1998 FWS BiOp, therefore, addressed a bigger scale view of the affects on bull trout in the identified districts but seems to anticipate a future consultation for specific ongoing future activities where any authorization of incidental take would be addressed. Ultimately the 1998 FWS BiOp concluded:

> After reviewing the current status of bull trout in the Columbia and Klamath River DPSs, the environmental baseline for the action area, the effects of implementation of the ACSs by LRMPs that include activities which may affect bull trout, and their cumulative effects, it is the Service's biological opinion that the action as proposed, when considered cumulatively, is not likely to jeopardize the continued existence of bull trout in those DPSs...This consultation does not address the specific effects of individual future actions.  The scope of analysis for evaluating the impacts of any activity on bull trout is the DPS as a whole.  The Level I teams through the streamline consultation process will evaluate effects of specific future actions on bull trout.

---

[8]  Citations to the FWS BiOp are made as to the document and page number stamped in the corner of the document pages.

(Document No. 627, p. 97).  This conclusion was based upon certain assumptions, one of which was that all actions in the watersheds containing bull trout would be consistent with PACFISH and that PACFISH strategies would be "strictly implemented."  (Document No. 627, p. 65).

Subsequently, the USFS requested consultation by the FWS for the NLF Project as result of its determination that implementation of the project was likely to adversely affect the Columbia River and Klamath River district populations of bull trout.  On February 10, 1999 FWS issued a concurrence letter for the NLF Project as requested by the USFS.  The FWS considered the NLF Project separately from other projects for the Lochsa River Drainage and ultimately concurred with the USFS that "the bull trout, or bull trout habitat, may be affected, but are not likely to be adversely affected as a result of implementing the [NLF] Project."  The concurrence was based upon certain specified factors in the biological assessment which involved the implementation of PACFISH and other efforts to minimize impact to the bull trout.

The Court rejects Plaintiff's argument that the Concurrence Letter is insufficient because it "failed to ensure compliance" with PACFISH.  See Pacific Coast and Cascadia supra (recognizing the agency does not have a duty to enforce the application of certain guidelines but, instead, to determine the projects impact on listed species).  As to the assertion that the FWS' findings are arbitrary and capricious by failing to properly analyze PACFISH and ACS, the Court agrees with Plaintiff.  The 1998 FWS BiOp includes a section entitled PACFISH Implementation which discusses the impact of the application of PACFISH and, in fact, notes many shortcomings of the actions on the preservation of bull trout and other species.  (Document No. 627, p. 54-55, 59, 67-69, 98).  On whole the 1998 FWS BiOp identifies serious concerns with the consistency of the implementation of PACFISH and ACS guidelines.  (Document No. 627, p. 68, 72).  The 1998 FWS BiOp also notes that PACFISH was "intended to be [an] interim strateg[y] that will be replaced by a long-term, comprehensive management strategy..."  (Document No. 627, p. 65).  The 1998 FWS BiOp concludes that so long as PACFISH, and similar guidelines, are strictly implemented there is "no jeopardy" to the listed species on whole but that "certain actions" may result in incidental take of bull trout, stating that those actions "will be subject to future site-specific consultation."  (Document No. 627, p. 98).  Leaving for another day the analysis and discussion of proposed project

for ESA compliance on the site-specific level.  While the Court agrees with the BiOp that it is impossible, let alone unfair, to expect the FWS to anticipate all possible circumstances and future impacts related to implementation of projects and actions on the watershed level, at some point the FWS must complete an analysis of a projects impact on listed species.  (Document No. 627, 98).

In this case, the FWS' subsequent concurrence letter appears to be the FWS opportunity to analyze and discuss a site specific action which it had put off to a future time in the 1998 FWS BiOp. The FWS concurrence letter, however, provides no real analysis of its decision.  The concurrence is based upon seven factors derived from the USFS' biological assessment.  The FWS letter lists the factors followed by brief comments but lacks any real discussion or analysis.  There is also no analysis of the application of PACFISH guidelines in the project.  More is required in order for the FWS to fulfill its duty under the ESA.  Because FWS put off analysis from the watershed level in the 1998 FWS BiOp to the project level, its analysis must be completed here at the site specific level as anticipated by the 1998 FWS BiOp.  Instead, this appears to be a never-ending cycle of putting off real discussion and substantive analysis of the projects impact on listed species to a future time which will never come.

Based on the foregoing, the Court finds the FWS acted arbitrarily and capriciously in failing to conduct real analysis of the NLF Project to determine whether it poses jeopardy to the threatened bull trout species under ESA.  Simply listing seven factors from the biological assessment fails to evidence any analysis by the FWS and, therefore, its conclusion that "the bull trout, or bull trout habitat, may be affected, but are not likely to be adversely affected" is arbitrary.

### ORDER

Based on the foregoing and being fully advised in the premises, the Court finds as follows:

1)      Plaintiff's motion for summary judgment (Dkt. No. 8) is **GRANTED IN PART AND DENIED IN PART**.

2)      Defendant's motion for summary judgment (Dkt. No. 26) is **GRANTED IN PART AND DENIED IN PART**.

3)      Defendant's motion to strike (Dkt. No. 24) **DEEMED MOOT** because the Court did not

consider the challenged proffers in rendering its decision.

DATED:  **September 21, 2005**

Honorable Edward V. Lodge
U. S. District Judge

MEMORANDUM DECISION AND ORDER - Page 28
05ORDERS\NezPerce_sj.WPD